**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | |
|---|---|
| **JULIUS WATSON** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) CV- 05-BE-1845-W |
| | ) |
| **MANNINGTON MILLS, INC.** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM OPINION**

This case is before the court on Defendant Mannington Mills, Inc.'s Motion for Summary

Judgment (Doc. 20).  The court, having considered the briefs and evidentiary submissions, finds

that Mannington Mills' motion (Doc. 20) is due to be GRANTED in its entirety. Thus, this case

is due to be DISMISSED WITH PREJUDICE.

**I.    FACTS AND PROCEDURAL HISTORY**

This summary judgment motion arises from Plaintiff Julius Watson's termination from

Mannington Mills' wood floor manufacturing facility in Epes, Alabama.  Mr. Watson alleges that

Mannington Mills unlawfully terminated his employment on the basis of race, in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. and 42 U.S.C. § 1981.

The facts[1] contained in the parties' evidentiary submission, viewed in the light most

---

[1]Plaintiff's response to Defendant's motion and supporting evidence completely fails to
abide by the court's "Summary Judgment Requirements" and Rule 56(c) of the Federal Rules of
Civil Procedure.  Plaintiff does not set forth numbered factual allegations labeled either
"Additional Undisputed Material Facts" or "Additional Disputed Facts."
    Plaintiff is represented by counsel.  While *pro se* litigants are accorded more leeway
concerning this court's summary judgment requirements, Plaintiff's counsel failed to cite to any

favorable to the non-movant, show the following:

On August 11, 1992, Mr. Watson, an African-American, began his employment with Mannington Mills.  He was hired by the Production Manager, Mr. C. Craig Pebble.  Several years later, in May, 1997, General Manager Mr. Raz Carter promoted Mr. Watson to the Night Watch Manager position.  As the Night Watch Manager, Mr. Watson initially reported to Mr. Carter; however, beginning in February, 1998, until his termination, Mr. Watson reported to Mr. Pebble.   As the second-shift Night Shift Manager, Mr. Watson oversaw all plant operations and directly supervised approximately 25 employees.

On January 25, 2005, Mr. Watson was physically assaulted by two of his subordinates, Mr. Derrick Jackson and Mr. Justin Banks.  Mannington Mills promptly terminated the employment of Mr. Jackson and Mr. Banks.  They were criminally prosecuted and banned from the plant premises.

Mannington Mills' management was concerned about the emotional impact that the assault had on the employees who witnessed or worked during the altercation.  Management hired Ms. Joanne J. Terrell, a social worker and professor from the University of Alabama, School of Social Work, to speak with employees on Saturday, January 29, 2005.

Prior to the meeting, on Friday, January 28, 2005, Gloria Walker, a storeroom clerk who administered aid to Mr. Watson after the assault, approached Mannington Mills Human Resources Manager Ms. Linda Shaw to speak in confidence.  Ms. Walker advised Ms. Shaw that

---

evidence in the record to support the facts proffered in response to Defendant's motion. Plaintiff's disregard of Rule 56(c)'s basic tenets does not create a duty of the court to locate facts favorable to the Plaintiff in the record.  Thus, the court is left with no reasonable choice but to adopt Defendant's "Statement of Undisputed Material Facts."

she was upset over the altercation but not surprised because many issues had arisen on Mr. Watson's shift.  This report was the first indication to Mannington Mills' management that it might have a problem with Mr. Watson's behavior.

On Saturday, January 29th, Mannington Mills shut down the plant early to allow its employees to attend the counseling session with Professor Terrell prior to the end of the shift. Management did not attend the meeting because it also did not want to inhibit Professors Terrell's ability to counsel employees.  After the two-hour counseling session, Professor Terrell met privately with Mr. Carter and Ms. Shaw to share the employees' concerns, as authorized by the employees.  Specifically, Professor Terrell advised Mr. Carter and Ms. Shaw that Mr. Watson posed a serious problem to Mannington Mills.  According to Professor Terrell, many employees expressed to her that they felt mistreated and intimidated by Mr. Watson.  Further, Professor Terrell found that the employees were afraid to take any issues or concerns to upper management or use Mannington Mills' Open Door Policy.

Mannington Mills investigated the employees' allegations concerning Mr. Watson. Beginning on Monday, January 31, 2005, Mr. Carter and Ms. Shaw interviewed virtually all (approximately 42) plant employees who currently or at any time had worked under Mr. Watson. Almost half of the employees interviewed raised very serious concerns about Mr. Watson, including the following:  (1) Mr. Watson's repeated breaches of Mannington Mills' Open Door Policy by telling employees not to bring issues to upper management, threatening employees if they complained, and retaliating against employees who went above Plaintiff; (2) Plaintiff's disclosure of personal employee information (including medical and disciplinary) to other

3

employees; and (3) Plaintiff's verbal mistreatment of employees.[2]

Mannington Mills' Open Door Policy encourages employees to bring any problems, questions or issues to their supervisor, Human Resources or senior management.  These conversations are confidential unless others have "a need to know."  Managers, including Mr. Watson, were instructed to encourage their subordinates to use the policy and to feel free to speak with senior management or Human Resources.  This policy is set forth in the Associate Manual and is given to all employees.

Mr. Watson's violations of the Open Door Policy were revealed by employees during the investigation.  For example, Mr. Watson told employees during a meeting that, if they "went upstairs," management would back him because management always backed the supervisor 100%. Further, Mr. Watson declared that he, Mr. Carter, and Mr. Pebble did not have time to speak with employees.  On another occasion, employee Ms. Gloria Walker requested permission from Mr. Watson  to leave a 12-hour shift two hours early if she found a substitute.  When Mr. Watson denied her request, she went to Mr. Pebble and acquired the requested approval.  When Mr. Watson learned of Ms. Walker's request to upper management, he threatened Ms. Walker's job security.

The investigation also revealed Mr. Watson's admonishment of employees Mr. W.B. Clark, Mr. Lindsey Jones, and Mr. Willie Sims for speaking with Mr. Pebble concerning workplace issues.  Mr. Watson allegedly retaliated against the above employees by making

---

[2]Employees raising these concerns included, among others, W.B. Clark, Gloria Walker, Will Sims, Keith Dubose, Mary Ezell, Marie Holder, George Washington, Mary Grant, Steve Green, Rennie Huff, Lindsay Jones, Eric Walker, Annette Wilson, Annie Drummond, Tommy Epps, Frankie Blackwell, and Tony Coleman.  All of these individuals are African-American.

adverse shift schedule changes, verbally abusing the employees, and failing to correct pay discrepancies with upper management following employee requests.

Mr. Watson returned to work on February 9, 2005.  Upon Mr. Watson's return, Mr. Carter, Mr. Pepple, Ms. Shaw and Mr. Roy Berrier, Mannington Mills' Director of Human Resources for its Wood Division, met with Mr. Watson to inform him about the results of the investigation.  Mr. Carter explained that the company had interviewed virtually everyone who worked under Mr. Watson, and summarized the information they received.  Mr. Carter informed Mr. Watson that over half of the interviewees had negative comments concerning his management style and that several interviewees expressed serious issues with the way Mr. Watson treated them.  Management told Mr. Watson that some employees were uncomfortable sharing personal information with him because he had disclosed confidences to other employees. Further, they told Mr. Watson that a number of employees heard him say at a crew meeting that, if employees went "upstairs," then management would back him 100%.  Also, Mr. Watson discovered that employees felt Mr. Watson retaliated against them for speaking with senior management and Human Resources.  Finally, a few employees stated that they transferred off the shift to get away from Mr. Watson.

After  informing Mr. Watson of these complaints, Mr. Carter asked Mr. Watson if he ever had done any of these things.  Mr. Watson responded that he had not previously heard any of the complaints.  Mr. Carter then asked Mr. Watson why he thought the employees would say such things about him.  In response, Mr. Watson claimed that he did not know.  Mr. Berrier told Mr. Watson that the allegations were serious and that Mannington Mills had to ensure that Mr. Watson's violations of the Open Door Policy did not put the company in a compromising

position.  Mr. Berrier further emphasized that, if Plaintiff thought of anything that could help in their investigation, he should call Mr. Carter, Mr. Pebble or Ms. Shaw.

Mannington Mills' management sent Mr. Watson home on leave and instructed him to be available on February 11 to discuss the company's post-investigation decision.  Plaintiff never contacted anyone in Mannington Mills' management to refute the allegations against him.  The management team consisting of Mr. Carter, Mr. Berrier, Mr. Pebble, and Ms. Shaw, in consultation with Mannington Mills' Human Resources Vice President, reviewed and analyzed the information obtained from employees together with Mr. Watson's denial of any knowledge concerning the complaints.  Many of the employees who reported complaints about Mr. Watson's violations of the company's policy and his mistreatment of them had excellent work records with no documented discipline or known disputes with Mr. Watson.  The management team found the employees to be credible.  Mr. Watson, however, never gave an explanatory response to the allegations, nor provided any information as to why so many employees would complain about him.

The company deemed Mr. Watson's repeated threats and retaliation against his subordinates for seeking senior management's assistance as much different and more serious than a single act of discouragement.  Thus, Mannington Mills concluded that Mr. Watson's actions were a blatant violation of the company's policy, and were contrary to Mannington Mills' employee relations philosophy and its core values.  Accordingly, the management team decided to terminate Mr. Watson's employment.

On February 11, 2005, Mr. Carter, Mr. Pebble and Mr. Shaw met with Mr. Watson.  Mr. Carter again informed Mr. Watson of the allegations uncovered in the investigation, and asked

Mr. Watson if he wanted more detail.  Mr. Watson indicated that he did not, and made no

attempt to refute the allegations or explain why employees would make these statements if they

were not true.[3]  Mr. Carter told Plaintiff that his employment with Mannington Mills was

terminated.  Mannington selected Raymon Harmon, an African-American, to replace Mr. Watson

as the Night Shift Manager.

Mr. Watson brought a proper and timely EEOC charge against Mannington Mills.  On

August 31, 2005, Mr. Watson filed his Complaint against Mannington Mills.  (Doc. 1).  His

Complaint alleged that Mannington Mills unlawfully terminated his employment on the basis of

race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. and 42

U.S.C. § 1981.  On May 15, 2006, Mannington Mills filed its Motion for Summary Judgment

(Doc. 20).  Following submission of Mr. Watson's response (Doc. 25) and Mannington Mills'

reply (Doc. 26), the court finds this case ripe for adjudication.

## II.    JURISDICTION AND VENUE

The court exercises jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Mr.

Watson fulfilled all jurisdictional requirements necessary for a claim brought pursuant to Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. and 42 U.S.C. § 1981. Also, the

court finds sufficient allegations supporting personal jurisdiction and venue.

---

[3]      All that Plaintiff said is that "it took them eight years, but they finally got me."  At his
deposition, Plaintiff explained that the "they" included Eric Walker (African American), Rennie
Huff (African American) and Jay Hayden (white), although could not point to any involvement
Hayden had in his termination.  Hayden was not interviewed in connection with the investigation,
nor did he have any input in the decision to terminate Plaintiff's employment.

## III.   STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact..." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)(quoting Fed. R. Civ. P. 56©)).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.

Rule 56(e) requires the non-movant to refrain from resting upon mere allegations or denials.  Fed. R. Civ. P. 56 ©).  Rather, by affidavits or other proper evidence, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." *Id*.  Failure to adequately respond results in the entry of summary judgment in the movant's favor. *Id. See also Celotex Corp.*, 477 U.S. at 325-27.  "[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party...  If the evidence is merely colorable, ...or is not significantly probative,...summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  In other words, the non-movant's mere assertion of conclusory allegations is insufficient to oppose a motion for summary judgment. *See Harris v. Ostrout*, 65 F.3d 912, 915 (11th Cir. 1995).

## IV.   ANALYSIS

### A.   Plaintiff's Title VII[4] Disparate Treatment Claim

---

[4]Plaintiff's one count Complaint asserts that this action is brought pursuant to Title VII, only.  *See* Complaint at ¶ 3.  In ¶20 of the Complaint, however, Plaintiff states that his

8

Mannington Mills moves this court for an order granting it summary judgment as to all Mr. Watson's claims against Mannington Mills. Specifically, Mannington Mills argues that Mr. Watson's claim of race discrimination based upon his termination is due to be dismissed. The court finds no genuine issues of material fact; therefore, the remaining questions concern matters of law.

Mr. Watson alleges that Mannington Mills unlawfully terminated his employment on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. and 42 U.S.C. § 1981. He may prove his disparate treatment claim under Title VII through either direct or circumstantial evidence. *See Burke-Fowler v. Orange Co., Fla.*, 447 F.3d 1319. 1322-23 (11th Cir. 2006). Mr. Watson does not contend that he has "direct evidence" in support of his claim of race discrimination. Thus, the traditional *McDonnell Douglas* burden shifting framework must be employed to evaluate Mr. Watson's claim. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792. 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089 (1981); *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000)(*en banc*).

Under the *McDonnell Douglas* burden shifting framework, Mr. Watson carries the initial burden of establishing a *prima facie* case of race discrimination under Title VII. *See Brooks v. County Comm. of Jefferson Co., Ala.,* 446 F.3d 1160, 1162 (11th Cir. 2006)(citing *McDonnell Douglas*, 411 U.S. at 802). To establish a *prima facie* case of disparate treatment based upon racial discriminatory animus, Mr. Watson must show the following elements: (1) he is a member

---

termination was in violation of both Title VII *and* 42 U.S.C. §1981 ("§1981"). *Id.* at ¶20. The court uses the same analysis for § 1981 claims as it does for Title VII claims. *See Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

of the protected class; (2) he is qualified for the position; (3) he was terminated despite his

qualification; and (4) he was subject to differential treatment, *i.e.*, he was either (a) replaced by

someone outside his protected class or (b) a similarly situated employee outside his protected

class engaged in nearly identical conduct and was not terminated.  *See Williams v. Motorola*, 303

F.3d 1284, 1293 (11th Cir. 2002);  *Keel v. U.S. Dep't of Air Force*, 256 F. Supp. 2d 1269, 1285

(M.D. Ala. 2003)

    First, Mannington Mills contends that Mr. Watson was not qualified to perform the Night

Shift Manager job.  *See* Doc 21, p. 19.   Specifically, Mannington Mills states the following:

> a person who intimidates, threatens, and retaliates against
> employees who seek to avail themselves of [Defendant's] Open
> Door Policy, who discloses private employee medical and
> disciplinary information to other employees, and who repeatedly
> abuses his subordinates to the point that numerous employees raise
> issues of mistreatment does not meet the qualifications necessary
> to be a manager at Mannington.

Doc. 21, pp. 19-20.  Therefore, according to Mannington Mills, Mr. Watson cannot meet the

second prong of his *prima facie* case.

    In response, Mr. Watson fails to provide any evidence either to refute the above

allegations or to bolster his managerial qualities.  Rather, Mr. Watson merely complains that the

employee statements garnered during the investigation and relied upon by Mannington Mills

contain "rumor and hearsay."

    Mr. Watson's short-shrift treatment of the second prong of his *prima facie* case, including

failure to meet the allegations head-on with evidence supported by the record, does not satisfy

Mr. Watson's burden.  Thus, Mr. Watson  failed to establish the second element of his *prima

facie* case and summary judgment is due to be granted on this claim.

Even assuming Mr. Watson met the second *prima facie* element head-on, he fails to meet the fourth prong of his *prima facie* case.  Mr. Watson bears the burden of showing that he was subject to differential treatment, *i.e.*, he was either (a) replaced by someone outside his protected class or (b) a similarly situated employee outside his protected class engaged in nearly identical conduct and was not terminated.  *See Williams*, 303 F.3d at 1293 (11th Cir. 2002).

First, the record reflects, and Mr. Watson does not dispute, that Mr. Watson was replaced by someone *within* his protected class.   Thus, Mr. Watson must show the court a similarly situated employee who engaged in nearly the same conduct but was not terminated.  Indeed, the Eleventh Circuit Court of Appeals has proffered a long history of binding precedent requiring a plaintiff to be similarly situated in all relevant aspects to the identified comparators.  *See, e.g., Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005); *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001).

Mr. Watson identifies Mr. Pebble as a comparator with the following statement: "Mr. Craig Pebble, a white male production manager, was attacked by an associate, Hubert Bowden, in the course of his employment with Mannington but Mannington did not investigate, terminate, or discipline Mr. Pebble."  Doc. 25, p. 12.  Not only does the above contention lack any cite to the record, but also it misses the "similarly situated" mark entirely.  While it may be accurate that both Mr. Watson and Mr. Pebble were viciously attacked, Mr. Watson fails to address Mannington Mills' argument that "[e]mployees had never before or since reported to plant management that any other manager had threatened and retaliated against them for utilizing the Open Door Policy."  The court is simply left with no evidence to fashion a similarly-situated comparator for Mr. Watson, and recognizes that this court has no duty to create one.  Plaintiff has

11

failed to meet the fourth prong of his *prima facie* case, and Mannington Mills is entitled to summary judgment.

Even assuming, *arguendo*, that Mr. Watson met his *prima facie* case, the court must examine whether Mannington Mills has offered a legitimate non-discriminatory reason for Mr. Watson's termination. *See, e.g., Burdine*, 450 U.S. 248. This burden is "exceedingly light." *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061.

Mannington Mills' provided evidence that Mr. Watson was discharged for three reasons: (1) violation of the company's Open Door Policy by repeatedly dissuading, threatening, and retaliating against employees who raised concerns to the company's upper-level managers; (2) disclosure of private employee information; and (3) mistreatment of subordinates on the second shift. An employee's violation of company policies or procedures constitutes a legitimate, non-discriminatory reason for the adverse action. *See, e.g., Bogle v. Orange County Bd. Of Com'rs*, 162 F.3d 653, 657 (11th Cir. 1998). The court finds that Mannington Mills has met this burden.

Once a legitimate, non-discriminatory reason for the employment action is articulated by the employer, "the plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination." *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001). The court recognizes that a variety of avenues arise for proving that Mannington Mills' articulated reasons for Mr. Watson's termination are mere pretext for discrimination. Nevertheless, in considering evidence of pretext in a discrimination case, the court is mindful that it does not "sit to second-guess the business judgment of employers. [A] plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason,

at least not where … the reason is one that might motivate a reasonable employer." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997).  In other words,

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarrelling with the wisdom of that reason.

*Hammock v. Nexcel Synthetics, Inc.*, 201 F. Supp. 2d 1180, 1187 (N.D. Ala. 2002). .

Mr. Watson makes no effort to show the court that Mannington Mills' articulated reasons are false.  Instead, Mr. Watson abandons the *McDonnell Douglas* framework and "respectfully submits that the concept of fundamental fairness is a valid criteria in determining the legitimacy of an assigned non-discriminatory rationale."  Doc. 25, p. 13.  The evidence before the court simply fails to create a triable issue as to whether Mannington Mills' legitimate, non-discriminatory reasons were a pretext for discrimination on the basis of race.

**B.     Plaintiff's Title VII Disparate Impact Claim**

In Mr. Watson's Response to Mannington Mills' Motion for Summary Judgment, he claims that his "termination resulted in an unlawful disparate impact upon management personnel employed by the Mannington Epes, Alabama facility of African-American origin."  Doc. 25, p. 14.  To support this contention, he provides a small litany of disparate impact law.  However, he fails to provide the court with *any evidence* to support this claim.  Further, his replacement is also African-American, so the court fails to see any basis for disparate impact.  Mr. Watson's burden has not been met, and this claim is due to be dismissed.

**V.     CONCLUSION**

13

For the foregoing reasons, the court, having considered the briefs and evidentiary submissions, finds that Defendant Mannington Mills, Inc.'s motion (Doc.20) is due to be GRANTED in its entirety.

A separate order will be entered contemporaneously.

DONE and ORDERED this 12th day of September 2006.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

14